SECURA INSURANCE COMPANY                                                        PLAINTIFF

v.

GRAY CONSTRUCTION, INC. d/b/a
JAMES N. GRAY CONSTRUCTION COMPANY, and
GREEN MECHANICAL CONSTRUCTION, INC.                          DEFENDANTS

### MEMORANDUM OPINION

This matter is before the Court upon Plaintiff, Secura Insurance Company's, Motion for

Determination of Coverage (DN 30).  Defendant Gray Construction, Inc., has filed a response (DN

36).  Defendant Green Mechanical Construction, Inc., has filed a response (DN 37).  Plaintiff has

filed a reply (DN 42).  This matter is now ripe for adjudication.  For the following reasons,

Plaintiff's motion is DENIED.

Also before the Court is Defendant Gray Construction, Inc.'s, Motion for Summary

Judgment (DN 33).  Defendant Green Mechanical Construction, Inc., has filed a response (DN 38).

Plaintiff has filed a response (DN 39).  Defendant Gray Construction, Inc., has filed a reply (DN 40).

This matter is now ripe for adjudication.  For the following reasons, Defendant Gray Construction,

Inc.'s, motion is GRANTED.

Also before the Court is Defendant Green Mechanical Construction, Inc.'s, Motion for

Summary Judgment (DN 34).  Plaintiff has filed a response (DN 39).  Defendant Green Mechanical

Construction, Inc., has filed a reply (DN 41).  This matter is now ripe for adjudication.  For the

reasons that follow, Defendant Green Mechanical Construction, Inc.'s, motion is GRANTED.

### BACKGROUND

In 2001 and 2002, TOYO Tire & Rubber Co., Ltd., ("Toyo") built an automotive parts plant

in Franklin, Kentucky. The Defendant, Gray Construction, Inc., ("Gray") was the general contractor for the project and entered into a subcontract with Defendant Green Mechanical Construction, Inc., ("Green") in June or July of 2001. The subcontract was for Green to install all the plumbing, heating, air conditioning, process piping and mechanical work at the Toyo facility. Richard Hughes was the project manager for Green.

The subcontract between Gray and Green set forth various requirements regarding insurance. First, the subcontract stated "Gray shall be named as an additional insured on the Subcontractor's Commercial (Comprehensive) General Liability policy." Section 15.1.2. set forth the details of Green's Commercial General Liability coverage requiring Green to purchase a Commercial General Liability policy with a one million dollar per occurrence limit of liability. This section also described the Commercial General Liability as including "Products and Completed Operations" coverage with a statement providing "[t]his policy shall add Gray as an insured thereunder by proper endorsement." However, there was no specific time period noted for length of completed operations coverage. Section 15.1.5 also required Green purchase an Umbrella Liability policy with a five million dollar per occurrence limit of liability.

The subcontract also addressed payment of attorney fees. The Subcontract states in Section 17.5 that Green is required to reimburse Gray for any

> attorney's fees, court costs and other expenses incurred in enforcing or declaring the Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Subcontractor, or incurred in any litigation or arbitration in which Gray without its fault, becomes involved by reason of the existence of this Agreement.

Green was insured by Secura Insurance Company ("Secura"). Secura issued to Green a primary policy number CP 3117471("Primary Policy") which was effective September 1, 2006

through September 1, 2007. Secura also issued Green an umbrella policy number CU 3117473 ("Umbrella Policy") which was effective September 1, 2006 through September 1, 2007.

Green began work on the Toyo project in 2001 and completed work sometime in 2002. In January, March and May of 2002, Gray executed nine Change Orders which supplemented the scope of work to be performed by Green on the Toyo project. Green continued to perform the work required by at least one of these change orders until June 11, 2002.

Green contracted with Thermal Balance, Inc., to perform balancing tests on the mechanical systems installed by Green. These tests were within the scope of work contemplated by the subcontract with Gray and were required in order to obtain a certificate of occupancy from the State. The tests performed by Thermal Balance, Inc., could not be performed until all of Green's work on a unit to be tested had been completed. Thermal Balance, Inc., performed a series of tests on May 1, 2002. Another series of tests were performed on June 11, 2002, at which time HVAC unit number 8, which serviced this mixing room, was balanced.

The Kentucky Department of Housing issued a Temporary Certificate of Occupancy for the entire Toyo facility on June 12, 2002. Toyo began operating the plant sometime thereafter.

On June 1, 2007, a fire started in the mixing room of the Toyo facility which allegedly caused injuries to Tina Ann Hall, a then employee of Toyo. Eleven days later, Hall died allegedly as a result of her injuries. L.V. Hall, Tina Ann Hall's widower, was appointed Administrator of her estate and he filed suit on behalf of himself and the estate in Simpson Circuit Court located in Franklin, Kentucky, on May 29, 2008. Both Gray and Green, as well as several others, are named as a defendants in the tort action in Simpson Circuit Court. Each of the defendants is alleged to have been negligent in the design, construction, inspection or maintenance of the Toyo facility.

Pursuant to the subcontract between Gray and Green, Gray demanded that Green provide a defense and indemnify it in the state court action. In turn, Green notified Secura of the demand by Gray. Neither Green nor Secura has provided a defense for Gray.

Secura filed this action for declaratory judgment in federal court on May 29, 2009. Secura seeks to resolve whether Secura currently owes a duty to defend or indemnify Gray as an "additional insured." Count I of Secura's Petition for Declaratory Judgment seeks a declaration that the scope of "additional insured" coverage in Secura's Primary Policy issued to Green does not cover Gray for the claims at issue in the state court action. Count II seeks declaration that the subcontract between Gray and Green did not require Green to include Gray as an "additional insured" under any excess or umbrella policy.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact

could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

Secura first argues Gray is not covered under the Primary Policy issued by Secura to Green for the claims raised in the underlying suit. Secura states Gray was covered as an additional insured; however, Gray was not entitled to completed operations coverage. Secura argues the subcontract between Gray and Green did not require Green purchase completed operations coverage for Gray, only for itself. Secura then argues that even if Gray was entitled to completed operations coverage, that coverage was subject to limitations which exclude coverage for the underlying claim. Specifically, Secura asserts Green's work was completed on or about May 1, 2002 and therefore completed operations coverage expired five years later, before the date of the accident on June 1, 2007. Gray and Green refute that the completed operations coverage was not required by the subcontract and argue Green's work was not completed until mid-June 2002, at the earliest.

Secura also argues Gray is not entitled to coverage under Green's Umbrella Policy as the subcontract did not require Green to purchase such coverage. Gray and Green assert Gray is entitled to coverage based on a policy provision providing umbrella coverage to insureds under a primary policy. Gray and Green reason that because Gray was covered under the Primary Policy Gray is, by definition, covered in the Umbrella Policy.

Gray also asserts that it is entitled to attorney fees related to this declaratory judgment action based on the terms of the subcontract. Secura refutes this and contends that Gray is not entitled to attorney fees for this coverage declaratory judgment action.

The Court will address each of these issues in more detail below.

### I. Policy Interpretation

"A federal court sitting in diversity must apply the substantive law, including choice of law rules, of the state in which it sits." *Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994). Here, the forum state is Kentucky. Under Kentucky law, a contract is interpreted according to the law of the state which has the most significant relationship to the transaction and the parties. *Lewis v. American Family Ins. Group*, 555 S.W.2d 579, 581-82 (Ky. 1977). Here, neither party contests that Kentucky law should apply. Furthermore, the insurance policy was issued to a named insured that was a Kentucky citizen and a Kentucky entity is asking for additional insured coverage for a bodily injury accident that occurred in Kentucky.

Under Kentucky law, the party seeking to establish coverage bears the burden of establishing that the incident at issue was within the scope of the policy. *North American Acc. Ins. Co. v. White*, 80 S.W.2d 577, 578 (Ky. 1935). However, the burden is on the insurer to establish that an exclusion bars coverage. *Travelers Property Cas. Co. of America v. B & W Resources, Inc.*, No. 6:05-CV-355

KKC, 2006 WL 3068810, *4 (E.D.Ky. Oct. 26, 2006); *Kentucky School Boards Ins. Trust v. Board of Educ. of Woodford County*, No. 2002-CA-001748-MR, 2003 WL 22520018, *9 (Ky. Ct. App. Nov. 7, 2003).  Once the insurer has shown that application of an exclusion, the burden shifts back to the insured. *Travelers Property Cas. Co. of America v. B & W Resources, Inc.*, 2006 WL 3068810, *4 (citing *Smith v. State Farm Fire and Cas. Co.*, 656 N.W.2d 432, 436 (Minn. 2003) and Lee R. Russ & Thomas F. Segalla, 17A *Couch on Insurance* 3d § 254:13 (2006)).

The Kentucky Supreme Court has set forth two principles of insurance contract interpretation: "(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and, (2) exceptions and exclusions should be strictly construed to make insurance effective." *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky.1992) (quotation marks and citations omitted). Kentucky courts have also held that this rule of liberal construction does not mean every doubt must be resolved against the insurer; "the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract." *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994); *see also Stone v. Kentucky Farm Bureau Mutual Ins. Co.*, 34 S.W.3d 809, 811 (Ky. Ct. App.2000) ("the terms should be interpreted in light of the usage and understanding of the average person").  Finally, in construing an insurance policy, the policy should be read as a whole. *Sun Life Ins. Co. v. Taylor*, 56 S.W. 668 (Ky. 1900).

## II. Primary Policy Completed Operations Coverage

Secura asserts Green's Primary Policy did not grant "completed operations" coverage to Gray.  Secura argues that such coverage is only allowed if such coverage was required by the subcontract between Gray and Green. Specifically, the Additional Insured Wrap in the Primary

Policy states in Section 2.B.4.:

> The coverage provided to the additional insured by this endorsement and by paragraph f. of the definition of "insured contract" under DEFINITIONS do not apply to "bodily injury or "property damage" arising out of the "products-completed operations hazard" unless required by the written contract or agreement.

Secura contends the subcontract between Gray and Green does not contain a provision specifically requiring completed operations coverage for Gray as an additional insured as required by this provision. Thus, Secura concludes the Primary Policy did not grant any completed operations coverage to Gray.

Both Gray and Green argue in response that the subcontract between them required Green obtain completed operations coverage for Gray. Gray and Green reference Section 15.1 of the subcontract entitled Subcontractor's Insurance. This section states in part that "Gray shall be named as an additional insured on the Subcontractor's Commercial (Comprehensive) General Liability Policy." Section 15.1.2 "Commercial General Liability" states in part: "Coverage shall be by Standard Commercial General Liability Occurrence Form including: Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and *Products and Completed Operations. This policy shall add Gray as an insured thereunder by proper endorsement*." (emphasis added).

Secura further argues that the subcontract only required Green obtain completed operations coverage for itself and not that Green purchase completed operations coverage for Gray as an additional insured. Secura argues the subcontract must have contained very specific wording that Green was required to purchase completed operations coverage in order for it to be provided under the Primary Policy. The Court finds although the exact words referenced by Secura in its reply were not used, words with similar import were.

In so finding, the Court must interpret the language of the subcontract between Gray and Green. The primary objective of contract interpretation by the Court is to effectuate the intentions of the parties. *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005) (citing *Cantrell Supply, Inc. v. Liberty Mutual Insurance Co.*, 94 S.W.3d 381, 384 (Ky.App.2002)). "When no ambiguity exists in the contract, we look only as far as the four corners of the document to determine the parties' intentions." *Id.* (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky.2000)); *see also Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699 (Ky. 2006). Only "[w]here a contract is ambiguous or silent on a vital matter, [may a court] consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties" *Cantrell*, 94 S.W.3d at 385. An ambiguous document is "one capable of more than one different, reasonable interpretation." *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981); *see also Cantrell*, 94 S.W.3d at 385.

The Court finds the language in the subcontract at issue here is unambiguous. Taking the contract together as a whole, the statement in Section 15.1.2, "this policy shall add Gray as an insured," references the clearly defined Commercial General Liability policy found directly preceding this statement. The subcontract detailed the types of coverage required and specifically named "Products and Completed Operations" coverage. This language states that Gray shall be added as an insured under Green's Commercial General Liability which was required to include completed operations coverage. The Court concludes the subcontract between Gray and Green required Green obtain completed operations coverage not only for itself, but also for Gray. As the subcontract required completed operations coverage for Gray, Gray is entitled to completed

operations coverage pursuant to the Primary Policy.

## A.  Completed Work  and Completed Operations Coverage

Secura argues that even if the Primary Policy did allow completed operations coverage to

Gray as an additional insured, that coverage only lasted for a period of five years after Green's work

was deemed completed.  Secura asserts that Green's work was completed on May 1, 2002 and since

the injury at issue in the underlying suit took place on June 1, 2007, Gray is outside the scope of

coverage.  Gray and Green argue Green's work was not completed until mid-June 2002 and

therefore the incident was within five years of completion.  Determination of this issue centers

primarily around several change orders that were executed by Gray and Green which altered the

scope of Green's work and the use of part of the building by Toyo, the owner, prior to completion

of those change orders.

The Primary Policy Additional Insured Wrap states that completed operations coverage only

continues

> for the period of time required by the written contract or agreement.  If no time
> period is required by the written contract or agreement, a person or organization
> status as an additional insured under this endorsement will not apply beyond the
> lesser of:
> > a. The period of time required by the written contract or agreement; or
> > b. Five years from the completion of "your work" on the project which is the
> > subject of the written contract or agreement.

Here, the subcontract between Gray and Green did not include any reference to continuation of

completed operations coverage for any specified period of time, therefore, coverage only continued

for five years after completion of Green's work.

The Commercial General Liability Coverage Form, Section V(16)(a)(2) defines "products-

completed operations hazard."   It states that Green's work is deemed completed at the earliest of

the following times:

> (a) When all of the work called for in your contract has been completed.
> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Here, there is only one job site, therefore subpart (b) is not applicable. The remaining two provisions are applicable, therefore the Court must determine which occurred earlier in time.

First, the Court must determine if this language is an exclusion or grant of coverage. Secura takes the position that this is not an exclusion, but an extension or grant of coverage. Gray and Green, however, assert that this is an exclusion. This distinction is meaningful in that the burden shifts depending on the classification: if it is considered an exclusion, the burden is on Secura, if not, the burden is on Gray and Green.

As noted by Secura, the policy language at issue here has been considered as both an extension of liability coverage as in *Kennerly v. The State of Delaware*, 580 A.2d 561, 564 (Del. 1990), and as an exclusion as in *Secura Ins v. Stainless Sales, Inc.*, 431 F.3d 987, 991 (6th Cir. 2005). *See also Trizec Properties, Inc. v. Millar Elevator Service Co.*, No. 203144, 1999 WL 33452700 (Mich. Ct. App. March 26, 1999) (treating products-completed operations hazard as an exclusion); *St. Paul Ins. Co. v. Bischoff*, 389 N.W.2d 443, 446 (Mich. Ct. App. 1986) (treating products-completed operations hazard as an exclusion). Following the binding precedent of the Sixth Circuit in *Stainless Sales*, as this Court must, the Court finds the language of the product-completed operations hazard will be treated as an exclusion. Therefore, Secura bears the burden of establishing that the exclusion applies. *Travelers Property Cas. Co. of America v. B & W*

*Resources, Inc.*, 2006 WL 3068810, at *4. Also, the exclusion must be strictly construed to make insurance effective. *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky.1992)

### i. All the Work called for in the Contract

First the Court will consider subpart (a): "When all of the work called for in your contract has been completed." Secura argues the work performed by Green after the May 1, 2002 testing by Thermal Balance, Inc., was no more than "service, maintenance, correction, repair" therefore, the work was completed for purposes of coverage on May 1, 2002. Secura cites the deposition testimony of Richard Hughes who stated unequivocally that all work had to be completed before Thermal Balance, Inc., could perform its tests. Richard Hughes Dep. 36:20-25, February 4, 2010.

Gray argues that Green was still performing warranty work until February of 2003 and that as long as Green was performing warranty work, Green's work was not completed for coverage purposes. Gray goes on to assert that even if Green's warranty work is excluded, Green's work was not completed until after June 1, 2002 due to the change orders executed by Gray and Green. Green similarly argues their work continued into June of 2002 because of additional work imposed by Change Orders 1, 5 and 9 which were authorized by the subcontract and were issued on January 29, 2002 and May 7, 2002. Each of these change orders referenced by Green required work related to the mixing room specifically.

Secura focuses on the last part of the policy defining completed work which states "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed," while overlooking the prior statement that work is deemed completed "[w]hen all of the work called for in your contract has been completed." Several cases

have held that work is not considered complete unless *all* the work called for in the contract is complete. *Secura Ins. v. Stainless Sales, Inc.*, 431 F.3d 987, 991 (6th Cir. 2006); *Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1143-44 (10th Cir. 2005) ("Acid washing was required under the contract, and the district court found as a fact that the acid washing had not been completed at the time the walls fell. The relevant coverage under the policy kicks in only after the work has been completed. So even if, when determining whether or not the work had been completed, we chose the narrower definition of 'your work' (namely, the work specified in the contract) and construe the policy in favor of coverage, [the subcontractor] loses."); *Generali v. National Trust Ins. Co.,* No. 5:07-cv-139-R, 2009 WL 2762273 (W.D.Ky. Aug. 27, 2009); *Southern Guaranty Ins. Co. v. Jeffares*, 379 S.E.2d 167, 169 (Ga. Ct. App. 1989) *abrogated on other grounds by Strozier v. Simmons U.S.A. Corp.*, 385 S.E.2d 677 (Ga. Ct. App. 1989); *Southern Guaranty Ins. Co. v. Scott*, 266 So.2d 602, 607 (Ala. 1972).

Section 2.2, entitled Subcontract Documents, states

> In addition to this document, the documents which form this Agreement and which are binding on the Subcontractor (collectively the "Subcontract Documents") include the Contract Documents identified in the contract between Gray and the Owner, which are incorporated by reference, and the Subcontract Documents set forth in Section 18.5.

Section 18.5(f) lists "change orders" as a Subcontract Document. Therefore, a plain reading of the subcontract between Gray and Green indicates the change orders were part of the contract. Applying the policy language, Green's work could not have been completed until all the work called for in the change orders, and therefore the contract, had been completed. Hughes has testified the work ordered in the Change Orders was not complete until after June 1, 2002. Hughes Dep. 65:12-67:15. In fact, Change Order 1 required "air balancing" which was not completed until June 11,

2002 when Thermal Balance, Inc., rebalanced a unit which had been altered by work performed pursuant to the change orders. Following the plain language of the contract and the policy, the Court concludes that not all the work called for in the contract was completed before June 1, 2002; therefore, under this subpart, completed operations coverage would continue beyond June 1, 2007, the date of the accident in the underlying case.

Furthermore, while the Court is aware that the policy states "[w]ork that may need service, maintenance, correction, repair or replacement" is considered complete, the Court does not believe the change orders are of this nature. Change Order 1 was executed by Gray on January 29, 2002 and by Green on February 2, 2002. This Order required significant work to the mixing room which included "add[ing] the mixing room HVAC and incinerator exhaust system with chill water piping, compressed air drop and natural gas piping to the rooftop HVAC unit." Hughes Dep. 23:17-19. This order also specifically required "air balancing" which was not completed until June 11, 2002. Based on the testimony of Hughes, performance of the air balancing was essential to the operation of this equipment and completion of the contracted work. Because of the significant nature of completion of this element of the contract work, the Court does not believe it was merely a "correction, repair or replacement" or even a "small finishing touch[]" as it is characterized by Secura. As this significant element of the contracted work was not completed until after June 11, 2002, the continued operations coverage extended beyond June 1, 2007.

### ii. Intended Use

The next applicable part of the policy is subpart (c): "When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." Generally, the standard products-completed

14

operations hazard exclusion as a whole, as set forth in this policy, has been held unambiguous. *Orthopedic Resources, Inc. v. Nautilus Ins. Co.*, 654 F. Supp.2d 1307, 1313 (N.D. Okla.2009) (citing *Goodwin v. Wright*, 6 P.3d 1, 8 (Wash. Ct. App. Div. 1 2000). However, this Court finds subpart (c) is ambiguous as it is capable of more than one different, reasonable interpretation. First, "that part of the work done at the job site" may refer to any part of the work that had been finished and was being put to use for its intended purpose. Second, this language may refer to use of "that part of the work done at the job site" out of which the injury or damage arose.

For example, applying the first interpretation to the facts of this case, the operative date would be March 2002, when Toyo began using several of the operational HVAC units which were in another portion of the building unrelated to the mixing room. Under this interpretation, in March 2002, "that part of the work done at the job site," i.e., the portion of the contracted work that was finished and operational, was put to its intended use by someone other than the contractor or subcontractor.

Applying the second interpretation, argued for by Gray and Green, the operative date would be sometime after June 12, 2002, when the mixing room where the accident occurred began to be used for its intended purpose. Here, "that part of the work done at the job site", i.e., the portion of contract work which caused the injury or damage, was not put to its intended use by someone other than the contractor or subcontractor until after June 12, 2002. It is irrelevant under this interpretation that another portion of the work was put to its intended use prior to that date.

The Court has found very little case law which discusses this specific subpart. A district court in Louisiana, in distinguishing other cases explained that in those cases "the product which caused damage had been put to its intended use," while in the case before the court the product

which caused the damage had not yet been put to its intended use. *Freeport McMoran Resource Partners, Limited Partnership v. Kremco, Inc.*, No. 92-0036, 1993 WL 268417 (E.D. La. July 13, 1993). Similarly, the Michigan Court of Appeals, when explaining why the operation performed by the defendant was complete, stated "[t]he portion of the work out of which the injury or damage arose . . . had been put to its intended use." *St. Paul Ins. Co. v. Bischoff*, 389 N.E.2d 443, 446 (Mich. Ct. App. 1986). These cases apply the second interpretation of the language "that part of the work done" and therefore require that the portion of the work out of which the injury arose must have been put to its intended use in order for it to be considered complete for purposes of coverage. This interpretation also complies with the general rule of policy interpretations that all ambiguities in the policy must be construed in favor of the insured. *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984)("If the contract has two constructions, the one most favorable to the insured must be adopted. If the contract language is ambiguous, it must be liberally construed to resolve any doubts in favor of the insured.").[1]

The Court, adopting the second interpretation, finds the record establishes the portion of the work out of which the injury or damage arose, the mixing room, was not put to its intended use until after June 12, 2002. Therefore, under this part of the definition, Green's work was not completed until after June 12, 2002, the date of Thermal Balance, Inc.'s, final report, as well as issuance of the Temporary Occupancy Certificate, and the date after which Toyo may have begun using the mixing

---

[1] The Court notes that Secura relies on *St. Paul Ins. Co. v. Bischoff*, 389 N.W.2d 443 (1985) and *Hanover Ins. Co. v. Hawkins*, 493 F.2d 377 (7th Cir. 1974) in arguing that, as in those cases, here Toyo began using some of Green's work for its intended purpose satisfying subpart (c). However, in both *Bischoff* and *Hawkins*, the work put to its intended use was the work from which the damage arose. Here, the work put to its intended use by Toyo was not related to the mixing room out of which the damage arose.

plant for its intended purpose. Completed operations coverage would therefore continue beyond June 1, 2007, the date of the accident in the underlying case.

In sum, Gray was entitled to coverage under the primary policy as the subcontract between Gray and Green required Green provide additional insured coverage for Gray including completed operations coverage. Under the policy, the completed operations coverage only continues for five years after the completion of Green's work. Green's work under the contract was not completed until the work required by the change orders was completed, no earlier than June 11, 2002. Similarly, that portion of work out of which the injury arose, the mixing room, was not put to its intended use until after June 12, 2002. Thus, the five year coverage period for completed operations coverage began to run on or about June 11, 2002. Regardless of the specific date on which the coverage began to run, coverage had not terminated by June 1, 2007, the date of the injury in the underlying action.

### III. Umbrella Policy Coverage

Secura argues Gray is not entitled to additional insured coverage under Green's Umbrella Policy unless Green was contractually obligated to provide such umbrella coverage. Secura specifically cites Part IV, entitled "WHO IS AN INSURED," section 2.C. which states in part that an insured under the umbrella policy is "[a]ny person, organization, trustee or estate to whom or to which you are obligated by virtue of a written contract to provide insurance such as is afforded by this policy." Secura asserts the subcontract between Gray and Green did not require Green to name Gray as an additional insured under any umbrella policy.

Gray and Green both assert Gray was covered by the Umbrella Policy because Gray was an additional insured included in the Primary Policy. Gray and Green cite Part IV section 2.D. of the

Umbrella Policy which states that an insured is "[a]ny additional **insured** (not you) included in the **primary policies** except as restricted elsewhere in this Part IV– WHO IS AN INSURED." (emphasis in original). Secura argues in response that Gray was not included as an insured in the Primary Policy because Gray was not listed on the declarations page of the Primary Policy as a named insured. Nor was Gray specifically added by name as an insured under the Primary Policy through specific endorsements. Secura argues that even if this Court finds that Gray has completed operations coverage under the Primary Policy, that does not mean Gray was included as an insured in the Primary Policy for purposes of the Umbrella Policy.

After review of both the Primary Policy and the Umbrella Policy, the Court, applying the plain meaning of the terms and construing any doubt in favor of the insured, believes the language of Part VI Section 2.D. provides Gray coverage under the Umbrella Policy. The Umbrella Policy sets out specifically who may be an insured and states simply "any additional **insured** . . . included in the **primary policies**" is considered an insured. The Court has found Gray was included in the primary policy for purposes of completed operations coverage and Secura has conceded in its initial motion that "[Secura's] Primary Policy *did* provide additional insured coverage to [Gray]." (Secura Mt. For Determination of Coverage Issues at 2 (emphasis added).)

**IV. Attorney Fees**

Finally, Gray asserts in its Motion for Summary Judgment that it is entitled to attorneys fees related to this declaratory judgment action based on the terms of the subcontract. The subcontract at Section 17.5 specifically states

> The Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Subcontractor, or incurred in any

> litigation or arbitration in which Gray without its fault, becomes involved by reason
> of the existence of this Agreement.

Secura contends that Gray is not entitled to attorneys fees for this coverage declaratory judgment action.

Determination of whether an insured is entitled to attorneys' fees resulting from an insurer's declaratory judgment action is a question grounded in state law. In Kentucky, it is a general rule, "that, with the exception of a specific contractual provision allowing for recovery of attorneys' fees or a fee-shifting statute, . . . each party assumes responsibility for his or her own attorneys' fees." *Aetna Casualty & Surety Co. v. Commonwealth of Kentucky*, 179 S.W.3d 830, 842 (Ky. 2005) (quotations marks omitted) (citing *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136 (Ky. 1991)). In *Aetna Casualty & Surety Co. v. Commonwealth of Kentucky*, the only Kentucky case to address this issue, the Kentucky Supreme Court held that the insured was not entitled to attorneys' fees incurred in the declaratory judgment action initiated by the insurer. *Id.* However, *Aetna* is distinguishable as there was no contract provision for fees as there is here. *Id.*

Looking at the language of the contract, Gray is entitled to attorneys' fees. The subcontract specifically states Green "shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses . . . incurred in any litigation . . . in which Gray, without its fault, becomes involved by reason of the existence of this agreement." The broad language of this section of the subcontract demonstrates the intent of the parties that Green should pay Gray's attorneys' fees and costs in the event of "any litigation," even in the case of a declaratory judgment action.

Secura points to *Bross v. Chevron U.S.A., Inc.*, to argue that, even in the case of broad contract language such as this, courts have refused to award attorneys' fees in declaratory judgment cases. No. 06-1523, 2009 WL 2579097 (W.D La. Aug. 19, 2009). In *Bross*, the contract language

at issue stated:

> 9.11.3 CONTRACTOR [Qualitech] shall promptly pay: (1) to any COMPANY INDEMNITEE [Chevron] all costs and reasonable attorneys' fees incurred by such COMPANY INDEMNITEE [Chevron] resulting directly from any and all loss, injury, liability and claims for which CONTRACTOR [Qualitech] is obligated to indemnify such COMPANY INDEMNITEE [Chevron], and (b) exclusive of costs and attorneys' fees incurred in connection with arbitration under Article 17, COMPANY INDEMNITEES' costs and reasonable attorneys' fees incurred in enforcing the provisions of this Contract or in any legal action in which COMPANY [Chevron] or any COMPANY INDEMNITEE prevails, in whole or in part, brought against CONTRACTOR [Qualitech] based on the breach of this Contract or to enforce an arbitration award.

*Id.* at *8. The court in *Bross* found that this language did not entitle Chevron to reimbursement of attorneys' fees incurred in pursuing insurance coverage and defense. *Id.* at *9. The Court notes the contract provision at issue in *Bross* was more narrow than the contract provision before the Court in this case. The Court must give full meaning to the terms of an enforceable contract. The subcontract between Gray and Green specifically requires payment of all attorneys' fees and cost associated with "any litigation."

Alternatively, the language of the subcontract provides fees for actions that arose "by reason of the existence" of the subcontract which necessarily includes this action. The Sixth Circuit in *Adkins v. Chrysler Financial Corp.*, applied Kentucky law regarding payment of attorneys' fees when interpreting a security agreement. 344 Fed. App'x 144, 148 (6th Cir. 2009). The language of the security agreement provided attorneys' fees "in connection with [Chrysler]'s exercise of any of its rights under this Agreement." *Id.* at 147. The court reasoned that the words "under this Agreement" limited Chrysler's right to fees to those actions arising directly under the security agreement. *Id.* at 148. The court concluded Chrysler was not entitled to attorneys' fees for its claims because they arose from state common law. *Id.* Here, the language of the contract states

Gray may recover fees from "any litigation" which Gray became involved with "by reason of the existence of this Agreement." This language is similar to that of the Security Agreement in *Adkins* which stated "under this Agreement." The declaratory judgment action now before the Court certainly arose only "by reason of the existence of this Agreement" between Gray and Green. Applying this reasoning to the contract language at bar, the Court concludes Gray is entitled to attorneys' fees pursuant to the subcontract between Gray and Green.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is DENIED; Defendant Gray Construction, Inc.'s, motion is GRANTED; Defendant Green Mechanical Construction, Inc.'s, motion is GRANTED. The Court notes this does not resolve all disputes before the Court. An appropriate order shall issue.